**STATE of Maine**

v.

**Wayne E. BECKUS.**

Supreme Judicial Court of Maine.

April 28, 1967.

Richard J. Dubord, Atty. Gen., and Leon V. Walker, Jr., Asst. Atty. Gen., Augusta, Lloyd P. LaFountain, County Atty., and Ralph H. Ross, Asst. County Atty., Alfred, for plainiff.

Robert G. Pelletier, Sanford, Edward G. Hudon, Brunswick, for defendant.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, RUDMAN, and DUFRESNE, JJ.

WILLIAMSON, Chief Justice.

The respondent, Wayne E. Beckus, was indicted for and found guilty of the murder of Charles C. Black at the September 1964 Term of the Superior Court for York County. The sole basis for appellate review lies in the denial of the respondent's motion for change of venue made after indictment and before trial in October 1964.

The summary statement of the case in respondent's brief reads in part:

"The crime alleged to have been committed was armed robbery of the First National Bank of Biddeford, South Berwick Branch. The State alleged that State Trooper Charles C. Black was killed when the robbery was committed and that Wayne E. Beckus was connected with the robbery—that Beckus was taking part in the robbery and therefore was a principal. * * *

\*   \*   \*   \*   \*   \*

"The evidence presented to the Jury indicated that at the time Charles C. Black was shot and killed, the Defendant was unarmed—that the fatal shot was fired by another, an accomplice, while the two were running out of the bank after the robbery alleged."

The grounds of the motion, made under the statute authorizing a Justice for cause shown to change venue (now 14 M.R.S.A. Sec. 508), read:

"Respondent moves for a change of venue, after the return of indictments against him for robbery and murder, and as grounds therefor states:

"1. That it is impossible for him to procure a fair and impartial trial in York County since the crimes alleged in the above noted indictments took place in South Berwick, a small town in York County on July 9, 1964.

"2. That the attendant publicity by television and radio (both of which cannot be reconstructed) and by newspapers (this being set forth in the affidavit attached hereto) have made it impossible for your Respondent to obtain a fair and impartial trial of his peers, which right is guaranteed to him under the Constitution of the United States and the Constitution of the State of Maine."

At the hearing on the motion newspapers were placed in evidence to indicate prejudicial pretrial publicity. Headlines from certain of the newspaper accounts follow: July 9, "Trooper is Slain In Holdup. Bandit Caught, Second Flees After South Berwick Heist"; July 10, "Ex-Navy Captain's Quick Action Collars Suspect, Pal Nabbed As Trooper is Shot to Death After South Berwick Bank Holdup"; July 11, "Robbery, Murder Suspect Is Held For Grand Jury"; July 12, "Day of Grief and Pride for A Brave Man"; July 16, "Twin-State Manhunt Largest in History"; July 16, "Handcuffed Prisoner, Wayne E. Beckus, is shown being hustled into the South Berwick lockup by Chief Deputy Sheriff Burleigh Richards, and Sheriff Richard Dutremble, following his capture by retired Navy captain Walter S. Buckley," and also, "Citizens Open Hearts, and Pocketbooks, Black Fund Drive"; July 17, "Reeds To Head Trust Fund For Black Children"; July 23, "$8,083 Raised So Far. Trooper Black Fund Drive Continues in York County"; July 24, "State Trooper Slaying Case is Postponed"; July 25, "Maine Opens Its Heart, Purse To Black Family"; August 28, "Trooper Black Fund Due To Benefit From Open House At Augusta Sunday"; August 29, "On Stage." showing a picture of Governor Reed and his family, "Television Actor Appears Sunday At Trooper Black Augusta Benefit"; August 31, "Reeds Host 10,000 At Open House"; September 24, "Boosting Trooper's Fund" with a picture of a theatre marquee, with a notice "Benefit Show Trooper Black Fund." Counsel offered the newspapers in evidence as "a representative cross-section of the coverage concerning these cases."

We may safely infer that the pretrial publicity by newspaper, radio, and television was continuous, widespread, and covered fully and completely the County of York. We may further infer that nearly every person in York County interested in the world about him, and who turned to his paper, radio, or television knew of the awful incident of July 9, of the oncoming trial of the respondent, and of the Trooper Black Fund.

Two questions are presented by the respondent. We quote from his brief:

"1. Did the pretrial publicity given by the various news media to the events which led to the trial of the Respondent make it impossible for him to obtain a fair and impartial trial in York County, the scene of the crimes alleged in the indictments returned against him?

"2. Was the respondent deprived of a fair and impartial trial in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States, and in violation of Article 1, Section Six of the Constitution of the State of Maine, as a result of the denial of a motion for a change of venue made in his behalf pursuant to (now 14 M.R.S.A. Sec. 508)?"[1]

The principles governing change of venue under the statute have been set forth plainly in our cases. Decision on a motion to change venue is a matter for the sound discretion of the Court. In the absence of abuse of discretion the decision stands. The power to change venue should be exercised with caution. Actual prejudice must be shown by the respondent. In terms of this case, the respondent must show such widespread prejudice throughout York County as would interfere with the obtaining of an impartial jury or with the calm orderly conduct of the trial. State v. Hale, 157 Me. 361, 172 A.2d 631; State v. Bobb, 138 Me. 242, 25 A.2d 229; State v. Donnell, 126 Me. 505, 140 A. 186.

The objective in the matter of change of venue is to ensure a fair trial guaranteed under the Constitutions to the accused. In the Federal Constitution, construed and interpreted by the Supreme Court, we have the supreme law of the land, which it is our duty to apply in this and every case. For our purposes we need consider only the impact of the Federal Constitution. The State and Federal Constitutions are alike in intent and purpose in this area.

In Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Supreme Court, in deciding that Dr. Sheppard had been deprived of a fair trial said, 86 S.Ct. at p. 1522:

"Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."

The Sheppard case involved both pretrial publicity and the conduct of the trial, characterized as held in a "carnival atmosphere." The rule, however, as stated above, is, in our opinion, a principle of constitutional law found by the Supreme Court and is applicable to the case at bar. It is immaterial that the Sheppard decision in 1966 was after the respondent's trial in 1964. The Court also said in Sheppard, supra, 86 S.Ct. at p. 1517:

"Only last Term in Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), we set aside a conviction despite the absence of any showing of prejudice. We said there: 'It is true that in most cases involving claims of due process deprivations we require a

---

1. U. S. Constitution, Amendment VI:
   "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, * * *."
   U. S. Constitution, Amendment XIV, Section 1:

"* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *."
Maine Constitution, Article I, Section 6:
   "In all criminal prosecutions, the accused shall have a right * * * to have a speedy, public and impartial trial, and, except in trials by martial law or impeachment, by a jury of the vicinity."

showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that' prejudice will result that it is deemed inherently lacking in due process.' At 542–543, 85 S.Ct. at 1632."

We may eliminate certain factors sometimes appearing in change of venue cases. (1) We are dealing only with pretrial publicity. The jury was sequestered at the trial. Whatever may have been published or broadcast during the trial could have had no effect upon the jury. (2) The pretrial publicity included no statements of or reference to confessions or admissions, either actual or purported. (3) The pretrial publicity did not include requests or demands for action by the authorities against the respondent. (4) The conduct of the trial was calm and orderly. There was no "carnival atmosphere."

In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), there was an intensely publicized press release by the police stating the accused had confessed, and furthermore nine of the twelve jurors on voir dire expressed a belief in the accused's guilt. The sheriff in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), "interviewed" the accused in jail on a televised motion picture with sound track. Obvious and compelling reasons for holding a denial of due process in the cases noted are not found in the record before us. On the conduct of the trial, see Turner v. State of Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), in which jurors were in custody of deputies who were principal prosecution witnesses, and Estes v. State of Texas, supra, with the problem of television in the courtroom.

We return to Sheppard for the guiding principles, recognizing that the case, as we have said, is a mix of both pretrial publicity and conduct of the trial.

We are left to consider the effect upon a fair and impartial trial (1) from the publicity before trial of the "holdup" of the bank and the killing of State Trooper Black, and (2) from the fund-raising for the benefit of the victim's family under the chairmanship of the Governor. Did this publicity and fund-raising before the trial establish a reasonable likelihood that a fair and impartial trial in York County would thereby be prevented? Sheppard, supra.

We emphasize that the issue before us is not the guilt or innocence of the respondent. Indeed, the respondent does not seek to have us test the verdict under the rule applicable in the usual criminal appeal.

In State v. Ladd, 159 Me. 431, at p. 432, 193 A.2d 914, the Court said:

"The only question raised by appeal from the denial of a motion for a new trial in a criminal case is whether, in view of all the testimony, the jury was justified in believing beyond a reasonable doubt that the respondent was guilty."

It is no answer, however, to the respondent that the record warranted the verdict. Under the Constitutions—Federal and State alike—he was entitled to have his case tried under the standards of due process. His trial must have been fair and impartial. If, then, a jury free from bias or prejudice could not have been found in York County, he was denied his constitutional rights.

In brief, the point is not whether the evidence to a fair-minded jury would sustain a guilty verdict, but whether the jury which *tried* him was free from bias or prejudice.

The extent of the publicity before trial is fully understandable. A State Trooper, a young man leaving a widow and small children, was killed in line of duty.

The collection of a fund for the benefit of Trooper Black's family was practical evidence of a deep and natural sympathy. The Governor's interest, through chairman-

ship of the Fund and the "Open House" attended by several thousand at Augusta, evidenced the widespread desire of people throughout the State to express loss in the death of an officer of the law.

The respondent argues that the publicity and fund-raising in a constitutional sense denied reasonable likelihood of a fair trial in York County. We do not share this view.

In the record of newspaper reports before us, we find continual reference to suspects, to the alleged murder, attempted holdup, and the like. We find no suggestions that the respondent should not receive a fair trial. There is nothing in the reports to arouse bias or prejudice against the respondent. There is no evidence whatsoever that radio or television coverage was of any different character.

Surely it does not follow that sympathy for the widow and children of Trooper Black, shot and killed in line of duty, results without more in one's inability to give Justice under law fairly and impartially to the accused.

The respondent offers the voir dire as conclusive proof, in the words of his brief, "that the 'state of mind' of the public at large in York County, and even of the 14 jurors, could not be 'indifferent' ".

The test of impartiality was stated by Chief Justice Hughes in these words:

> "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." United States v. Wood, 299 U.S. 123, 145, 57 S.Ct. 177, 185, 81 L.Ed. 78.

The motion to change venue was made, heard, and decided before the voir dire. The respondent, in our view, lost nothing in not renewing his motion thereafter. From the evidence taken on the voir dire of the fourteen accepted jurors, there is ample evidence to sustain the findings of their impartiality and freedom from bias or prejudice.

The argument of the respondent, however, is that the extent of the voir dire in itself is proof that no impartial jury could have been found in the County. In short, the contention is that the error claimed in failing to change venue by reason of pretrial publicity and fund-raising, was further evidenced by the actual experience on the voir dire.

Ninety-two prospective jurors were examined on voir dire from whom fourteen jurors (twelve regular and two alternates) were chosen. Of the seventy-eight excused, the State excused six, the respondent thirteen, and the Court the remainder. The record does not include the examination of the seventy-eight excused.

Turning to the fourteen jurors, the record shows that all had read newspaper reports of the events leading to the trial; that two of the jurors had contributed to the Trooper Black Fund, and one was uncertain whether or not he had contributed; that twelve of the fourteen knew of the Fund; that the wife of one of the jurors attended the open house held by the Governor in Augusta in connection with the Fund; and that one juror had a checking account in the bank that was robbed.

We are not convinced that the necessity of examining ninety-two prospective jurors to obtain fourteen acceptable on the record for jury service, established a "state of mind" in York County in which a jury competent to give Justice could not have been obtained.

Of course the prospective members of the jury knew of the awful event of July 9. Of course they read and heard of the arrest and indictment of the respondent before coming to court for jury service. Such general knowledge is not a sound, let alone a compelling, reason for transfer of the case from York to another County.

The respondent is placed on trial "upon his country, which country you are." These ancient words express the rule that the accused in the absence of good cause is tried by a jury of his peers in the county where the alleged crime occurred.

An accused cannot insist that the county in which the alleged crime occurred shall have been insulated from publicity. If the publicity is not of a nature creating bias and prejudice, there can be no objection that it is widespread. The same principle is applicable to the fund-raising for Trooper Black's family.

██ The record discloses no reasonable likelihood that the respondent could not obtain a fair trial in York County. His constitutional rights were fully protected. The Court properly denied the motion for change of venue.

The entry will be:

Appeal denied.